No. 4:13-CV-00102-D

| | |
|---|---|
| CINDY LYNN CARMONA, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| v. | ) **MEMORANDUM AND** |
| | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings

[DE-25, -30] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant Cindy Lynn

Carmona ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial

review of the denial of her application for a period of disability, Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") payments. Claimant also filed a response to

the Commissioner's motion [DE-34], and the pending motions are now ripe for adjudication.

Having carefully reviewed the administrative record and the motions and memoranda submitted by

the parties, it is recommended that Plaintiff's Motion for Judgment on the Pleadings be allowed,

Defendant's Motion for Judgment on the Pleadings be denied, and the case be remanded to the

Commissioner.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability, DIB, and SSI on August

27, 2009, alleging disability beginning March 1, 2005. (R. 94-95, 244). Both claims were denied

initially and upon reconsideration. (R. 94-95, 148-49). A hearing before Administrative Law Judge

("ALJ") Michelle Cavadi was held on May 18, 2011, at which Claimant was represented by counsel, and a witness and a vocational expert ("VE") appeared and testified. (R. 38-93). On October 21, 2011, the ALJ issued a decision denying Claimant's request for benefits (R. 21-32), and the Appeals Council denied Claimant's request for review on February 22, 2013 (R. 1-6). Claimant then filed a complaint in this court, seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq*., is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

in 20 C.F.R. §§ 404.1520, 416.920:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently
> working; and (2) must have a "severe" impairment that (3) meets or exceeds [in
> severity] the "listings" of specified impairments, or is otherwise incapacitating to the
> extent that the claimant does not possess the residual functional capacity to (4)
> perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails

at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65

F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of

the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other

work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with

the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This

regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of

functional limitation resulting from a claimant's mental impairment(s): activities of daily living;

social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§

404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision

pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3),

416.920a(e)(3).

In this case, Plaintiff alleges the following errors: (1) the ALJ erred in determining that

Claimant's impairments did not meet Listings 1.04, 11.09, 12.05, and 14.09; (2) the ALJ erred in

evaluating the medical opinions; (3) the ALJ erred in determining that Claimant's fibromyalgia was

3

not debilitating; (4) the ALJ erred in failing to pose a complete hypothetical to the VE; (5) the ALJ erred in assessing Claimant's credibility; (6) the ALJ erred in concluding that Claimant could perform certain jobs; and (7) the Appeals Council erred by rejecting an updated medical source statement and refusing to consider new and material evidence in the form of updated medical records. Pl.'s Mem. [DE-26] at 3, 9-30.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. (R. 23-32). At step one, the ALJ found Claimant had not engaged in substantial gainful employment since the alleged onset date. (R. 23). Next, the ALJ determined Claimant had the following severe impairments: scoliosis, fibromyalgia, depression, fatigue, and headaches. *Id.* At step three, the ALJ concluded that Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24-25). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in activities of daily living and social functioning, moderate difficulties in concentration, persistence and pace, and no episodes of decompensation of extended duration. (R. 24). Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work with additional limitations (i.e., lifting and carrying 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk six hours in an eight-hour work day; occasional stooping and crouching; no repetitive reaching overhead; avoid moderate exposure to noise and no vibration; avoid concentrated exposure to hazards; no climbing ladders, ropes, or

4

scaffolds; occasional climbing of ramps and stairs; and unskilled work–simple, routine, and repetitive–with only routine changes).[1] (R. 25-30). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 26). At step four, the ALJ concluded that Claimant could not perform the requirements of her past relevant work. (R. 31). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined that Claimant was capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 31-32). Accordingly, the ALJ determined Claimant was not disabled from the alleged onset date through the date of decision. (R. 32).

## B.    Testimony of Claimant

At the time of the administrative hearing, Claimant was 36 years old, divorced, and living with her three children of ages eight, twelve, and fifteen. (R. 44-45). Claimant was in special classes, but graduated from high school in 1993 and attended a technical school from 1997 to 1998, receiving a certificate in early childhood development. (R. 45, 67). Claimant last worked as a teacher at Children's Academy from 1997 to 2001, and stopped working after she married, became pregnant, and moved to another town, explaining it was "cheaper just to stay home." (R. 45). Claimant also previously worked part-time as a child care provider at a gym and full-time as a server in a restaurant. (R. 46).

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

5

Claimant was diagnosed with scoliosis as a child and underwent back surgery at age 12, which allowed her to lead a relatively normal life, participating in the high school marching band and engaging in physical activities such as jogging. (R. 47, 63). She became unable to work in March 2005 after an automobile accident, in which the airbag deployed and she hit her shoulder, head, and neck. (R. 47-48, 64). As a result she developed several conditions interfering with her ability to work, including seeing spots and dizziness, migraines, pain in her arms (more severe on the left), left shoulder, neck, back, spine, and bones, skin soreness, and aching legs, joints and muscles, which causes numbness in her hands and legs, as well as fatigue. (R. 45, 47, 64-65). At times Claimant feels like her legs are giving out and has difficulty balancing and walking. (R. 66). Claimant described feeling as if something is "scraping inside my bone like metal." (R. 47). Claimant also had a slip and fall in 2006 at a grocery store and a second automobile accident in 2008, both of which exacerbated her pain. (R. 48-49).

Claimant was diagnosed with fibromyalgia for which she takes medication, and she also takes pain medication and a muscle relaxer, which helps alleviate her pain to approximately a level six on a scale of one to ten. (R. 49-50). To help alleviate her pain, Claimant lies down, elevates her legs and then changes positions after 15 to 20 minutes. (R. 50). When Claimant was receiving treatment from Dr. Adams, her pain medication was effective at times, reducing her pain to a level three, and sometimes level one if she was still or napping. (R. 50-51). However, claimant moved and, in the process of finding a new doctor, changed to medications that proved less effective. (R. 51). Physical therapy helped some with her pain, but worsened the pain in her left shoulder, which protrudes due to scoliosis. (R. 53). Claimant had been treated for depression as a result of her pain, and she cries frequently. *Id.* She takes medication for depression that has been somewhat helpful and saw a

6

counselor in 2009. (R. 53-54). Claimant has no problems being around people as a result of her depression, and prefers to be with family and friends as opposed to by herself. (R. 54). Claimant also has memory problems and experiences confusion and difficulty thinking. (R. 54, 65). For example, she forgets when she has to do a project or why she is going to the refrigerator and has to take notes and write things down to help her remember. (R. 54-55). She also has difficulty reading and writing, because she gets confused and has numbness in her hand. (R. 62). Claimant has headaches daily, each lasting two to three hours in duration, and stopped taking her migraine medication one to two years prior to the administrative hearing, perhaps because she moved but she could not precisely remember. (R. 56-57). Claimant's physician advised her to see a rheumatologist, and she was in the process of finding one. (R. 57). Claimant has had three MRIs of her brain, which showed light spots and she was told she had multiple sclerosis and needed another test, but she stopped seeing the neurologist in part because her insurance lapsed. (R. 65-67).

Claimant's impairments have negatively impacted her day-to-day functioning. She estimated she can sit for only 15 to 30 minutes and stand for only 15 to 20 minutes before needing to rest and can only lift five pounds. (R. 55-56). Claimant sometimes drives, but stays home most every day. (R. 44). She is left-handed and is limited in her activities by left-arm pain, and she can no longer run, walk far, or play ball with her son. (R. 53). On a typical day, Claimant gets her kids off to school and then lies down to nap for a couple hours to relieve her aching muscles and joints. (R. 59). Afterward, she makes something to eat and tries to clean up after herself if she is feeling well enough. *Id.* When she does any cleaning, she has to stop and rest then go back to the task later, and a task like making spaghetti that should take 30 minutes would take her three hours. (R. 59-60). Her daughters help her with household chores and cooking, and her fiancé helps with the shopping. *Id.*

7

Throughout the day, Claimant sits for 20 to 30 minutes at a time and watches television and then lies back down to get more comfortable. (R. 59). She does not feel well enough to do activities with her children after they return from school. (R. 60-61). Claimant does go out some to visit family, but people mostly come to visit her at her home. (R. 61). In addition to watching television, Claimant likes to lie on the beach and relax when she gets a chance and would like to do more, such as go to the mall, but she has to sit down after 10 minutes of walking and does not go shopping often. *Id.* Claimant sometimes goes to Sunday school and church for a couple of hours, but is not active in any groups. (R. 61-62).

## C.  Testimony of Claimant's Mother

Claimant's mother, Barbara Meadows, testified at the administrative hearing. (R. 70-77). Ms. Meadows recalled that after Claimant's accident in 2005, Claimant was not the same person and never got better. (R. 71-72). Ms. Meadows was still working at the time of Claimant's accident and would go to Claimant's house after work to help out. (R. 75). After Ms. Meadows retired, Claimant lived with her for approximately two years from 2008 to July 2010. (R. 71). She observed Claimant could not care for herself or her children, because she was always sick, in constant pain, depressed, crying, and could not stay awake. (R. 72). She also testified that Claimant was up walking throughout the night, because her bones ached and that she limped and stumbled due to her constant pain. (R. 72-73). Ms. Meadows recalled Claimant had daily migraine headaches that required her to lie down frequently. (R. 74-75). Ms. Meadows said she did everything for Claimant, including taking her to doctor's appointments and cooking and doing her laundry. (R. 72-73). Since Claimant moved out in 2010, her mother only sees her once or twice a month, but says Claimant's condition has not improved and that she remains confused and is often forgetful. (R. 73).

8

## D. Testimony of Vocational Expert

Dr. Ann Neulicht testified as a VE at the administrative hearing. (R. 78-89). After the VE testified regarding Claimant's past work experience (R. 79-80), the ALJ posed the following hypothetical:

Assume existence of an individual who is 36 years old, let's just consider it to be a younger individual, has a high school education plus certification in early childhood development. Assume further this individual has the residual functional capacity to perform light work lifting up to 20 pounds occasionally, up to 10 pounds frequently. There should be only occasional stooping and crouching; no repetitive reaching overhead; they should avoid even moderate exposure to noise; avoiding concentrated exposure to hazards; no climbing of ropes, ladders, scaffolds; occasional climbing of ramps and stairs. Her work should be unskilled, simple, routine, repetitive in nature with only routine changes. Would they be able to do any of their past work?

(R. 80-81). The VE opined that skill level would preclude past work, but that the hypothetical individual could perform the following jobs: office cleaner (DOT # 323.687-014), office helper (DOT # 239.567-010), and mail clerk (DOT # 209.687-026). (R. 81-82). The ALJ then asked whether there would be any jobs available if the exposure to noise restriction was lowered to quiet. (R. 82-83). The VE responded that the jobs of information clerk (DOT # 237.367-018), surveillance system monitor (DOT # 379.367-010), and food checker (DOT # 211.482-014) would fit the ALJ's hypothetical. (R. 83). The VE also stated that none of the cited jobs require exposure to vibration. *Id.*

Claimant's attorney then posed the following hypothetical to the VE:

If you would assume a 36-year-old woman with a high school degree and a certificate in early childhood education with a verbal IQ score of 73 with the following impairments as set forth in the medical source statement by treating physician Dr. David Paul Adams; who can stand no more than 15 minutes at one time; who can sit no more than 15 minutes at one time; who can lift no more than five pounds occasionally and can lift no weight frequently; who can never use her left hand, her dominant hand for either fine or gross manipulation; who can never raise her left arm over shoulder level. . . . Who can never work around dangerous equipment; who can

9

never tolerate noise exposure. Who needs to elevate her legs most of the time in an eight-hour workday; who is unable to ambulate effectively; who can only occasionally bring her chin to her neck. . . . Who suffers migraine headaches daily which last several hours; and who is unable to work while suffering a migraine. With those assumption[s] in place, in your opinion, would there be any type of work activity existing in significant numbers in the national economy that you feel the claimant could perform?

(R. 84-85). The VE responded that the stated limitations, primarily the daily migraine headaches and elevating of the legs most of the time, would preclude substantial gainful activity. (R. 85-86). In response to questioning by Claimant's counsel, the VE further opined that the limitation on lifting no more than five pounds could be important and would preclude the office cleaner, office helper, and mail clerk jobs, but would not preclude the surveillance system monitor, information clerk, or food checker jobs. (R. 86-87). The VE also opined that no jobs would be available for an individual with the limitations alleged in the hearing testimony. (R. 89).

## V. DISCUSSION

### A. The ALJ's Evaluation of the Listings

Claimant first contends that the ALJ erred in not finding that Claimant's impairments meet Listings 1.04, Disorders of the Spine; 11.09, Multiple Sclerosis; 12.05, Intellectual Disability; and 14.09, Inflammatory Arthritis. Pl.'s Mem. at 3, 15-17. However, Claimant only addresses in detail why she meets Listing 12.05, and makes no specific assertions as to how the ALJ's determinations as to the other Listings were in error. *Id.* "Plaintiffs bear the burden of proving their condition meets a listing and, accordingly, the responsibility of producing evidence to sustain their claims." *Rowe v. Astrue*, No. 5:07-CV-478-BO, 2008 WL 4772199, at *1 (E.D.N.C. Oct. 28, 2008) (citing *Pass v. Chater*, 65 F.3d at 1203). Thus, where a claimant "fails to articulate why her medical impairments do, in fact, meet all of the elements of a given listed impairment," she fails to meet her burden. *Id.*

10

(citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Thus, the discussion here is limited to Listing 12.05C.

To meet the requirements of Listing 12.05, a claimant's impairment must first satisfy the diagnostic description for intellectual disability.[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A. Specifically, the claimant must demonstrate (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning; and (3) onset before the age of twenty-two. *Id.* § 12.05. "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)). Upon satisfaction of the diagnostic description, the claimant must meet the required severity level of the disorder, which is accomplished by satisfying any one of four categories labeled (A)-(D). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

In this case, Claimant contends she satisfies the intellectual disability listing under category C, which requires (1) a valid verbal, performance or full scale IQ of 60 through 70; and (2) another impairment, physical or mental, imposing an additional and significant work-related limitation of function. *Id.* § 12.05C. The "significant work-related limitation" requirement is satisfied where the ALJ has found that a claimant has other severe impairments. *Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A (describing "significantly limits" as, "i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c)

---

[2] Effective September 3, 2013, the term "mental retardation" was replaced with "intellectual disability" in the Listing of Impairments. *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499 (Aug. 1, 2013).

and 416.920(c)").

At step three in the sequential evaluation process, the ALJ did not expressly evaluate Listing 12.05C, but did make the following relevant findings:

The claimant was noted to have a verbal IQ of 73, tested in 1982, but a Full Scale IQ of 78, which the attorney argued supported a finding of borderline intellectual functioning. However, none of the claimant's mental health providers noted that she had any issues with learning or intellectual functioning. The claimant did not allege learning difficulties and her ability to work at SGA levels at semi skilled jobs does not support that the claimant has borderline intellectual functioning, even if she "struggled" in school, according to her attorney (Exhibit 14E).

(R. 25). The ALJ further stated as follows when addressing the brief filed by Claimant's counsel: "The claimant's attorney argued that she met Medical Listings 12.05 (mental retardation) which is confusing since the claimant's IQ scores from over 20 years ago do not meet the criteria of this listing." (R. 30). The record reflects that Claimant received a verbal IQ score of 67 in 1984 (R. 333-37), which is within the range to satisfy the IQ prong of the category C severity criteria for Listing 12.05. However, in summarizing the results of this testing, it was noted that Claimant has "borderline intellectual ability overall" and that Claimant "is not a retarded student." (R. 336). Borderline intellectual functioning involves a lesser degree of intellectual deficiency than mental retardation. *See Diagnostic and Statistical Manual of Mental Disorders*, 740 (4th ed., Text Revision 2000); *see also Jordan v. Comm'r of Soc. Sec.*, 470 F. App'x 766, 768-69 (11th Cir. 2012) (noting that a diagnosis of borderline intellectual functioning is "mutually exclusive of mental retardation"). Thus, it is questionable whether Claimant did in fact meet the IQ prong of the category C severity criteria. Nevertheless, the ALJ erred in failing to consider the potentially qualifying IQ score.

This does not, however, end the inquiry where both the diagnostic criteria and the category C criteria must be satisfied in order for Claimant's mental impairments to meet Listing 12.05C. *See*

12

*Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) (finding that the claimant can prevail only by establishing that the ALJ erred in his analysis of both the diagnostic criteria and the category C criteria). Here, it is clear from the ALJ's decision that she believed Claimant did not satisfy the diagnostic criteria, and substantial evidence in the record supports such a conclusion. The ALJ recognized that "none of the claimant's mental health providers noted that she had any issues with learning or intellectual functioning" and that Claimant had the "ability to work at SGA levels at semi skilled jobs." (R. 25). Further, while Claimant testified to being in special education classes, she also graduated from high school, received a certificate in early childhood education from a technical school, and worked in her chosen field until she stopped working because she got married and moved, making it "cheaper just to stay home." (R. 45-46, 67). *See Bennett v. Colvin*, No. 4:12-CV-152-FL, 2013 WL 4417605, at *3 (E.D.N.C. Aug. 15, 2013) (finding claimant did not have the requisite deficits in adaptive functioning where, among other things, plaintiff graduated from high school and took auto mechanic courses at a community college, and "has a long work history with earnings at the substantial gainful activity level"). Accordingly, Claimant has failed to demonstrate on this record that she meets Listing 12.05C, and the ALJ's decision is supported by substantial evidence.

**B.     The ALJ's Credibility Assessment**

Claimant contends that the ALJ' credibility assessment of Claimant's testimony was based on an erroneous finding that Claimant's statements regarding a head injury were inconsistent with the record, Pl.'s Mem. at 26-27, and that the ALJ inappropriately considered that Claimant is able to care for her children, Pl.'s Resp. [DE-34] at 2, and has a poor work history, *id.* at 3. The Commissioner asserts that the ALJ's considerations were proper and supported by substantial

13

evidence in the record. Def.'s Mem. [DE-31] at 6-9. While the undersigned agrees with the Commissioner that the types of considerations cited by the ALJ were proper, the record lacks substantial evidence to support the ALJ's stated reasons.

It is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."). Federal regulations 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *See Craig*, 76 F.3d at 593-94. First, as an objective matter, the ALJ must determine whether Claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Id.*; *see also* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). If this threshold question is satisfied, then the ALJ evaluates the actual intensity and persistence of the pain or other symptoms, and the extent to which each affects a claimant's ability to work. *See Craig*, 76 F.3d at 595. The step two inquiry considers "all available evidence," including objective medical evidence (i.e., medical signs and laboratory findings), medical history, a claimant's daily activities, the location, duration, frequency and intensity of symptoms, precipitating and aggravating factors, type, dosage, effectiveness and adverse side effects of any pain medication, treatment, other than medication, for relief of pain or other symptoms and functional restrictions. *Id.*; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *3. The ALJ may not discredit a claimant solely because her subjective complaints are not substantiated by objective medical evidence. *See Craig*, 76 F.3d at 595-96. However, neither is the

14

ALJ obligated to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *3.

The ALJ cited three reasons for questioning Claimant's credibility. First, the ALJ noted that Claimant testified she hit her head in the 2005 automobile accident and as a result experienced migraines, confusion, and vision problems, but that the emergency department records do not indicate Claimant suffered a head injury.

> In regards to credibility, the undersigned notes that the claimant testified that during the car accident in May 2005, she hit her shoulder and head, and her migraines started after the accident. During a treatment visit the month after the claimant's car accident, she reported that her headaches had intensified since her accident, in which she suffered a "head injury" (Exhibit 4F). She also blamed her confusion and vision problems on the accident; however, the record shows that after the accident, the claimant reported that she hit the steering wheel with her chest only. The emergency department records show the claimant never reported hitting her head, and she had no complaints of headache or double vision. Further, the emergency room physicians did no imaging of the claimant's head, presumably because she had suffered no trauma to her head (Exhibit 3F). This inconsistency calls into question the credibility of the claimant.

(R. 29). The ALJ was correct in noting that the emergency room record regarding Claimant's May 3, 2005 automobile accident indicates Claimant received injuries to her chest (R. 455) and that the physical exam review revealed no evidence of head trauma (R. 456). However, the record is replete with references to Claimant's reports of headaches and vision problems within a day of her accident.

The emergency room record notes that, in addition to hitting her chest, Claimant suffered injury to the back of the neck. (R. 456). Three days later, on May 6, 2005, Claimant visited her doctor, reporting that she had been experiencing headaches and seeing black dots since her accident and a head CT was recommended in the event these symptoms persisted. (R. 609). On May 11, 2005, Claimant returned to her doctor and reported still seeing black spots, with the possibility of

15

concussion noted and a head MRI ordered. (R. 608). On May 15, 2005, Claimant underwent a brain MRI. (R. 655). The treatment note read, "Patient in MVA 5-3-05 with visual changes, occipital headaches . . . ," and the results indicated white matter characterized as unusual for Claimant's age that can be associated with a variety of disorders, including chronic migraine disorders. (R. 655-56). On May 16, 2005, Claimant followed up with her doctor, continuing to see black spots and experiencing occasional light-headedness, and again the possibility of concussion was noted, as well as the abnormal MRI, and Claimant was referred to a neurologist. (R. 607). On May 20, 2005, Claimant saw a neurologist who noted as follows:

> On May 3 [Claimant] was involved in a car accident. Someone ran a red light and she hit the car as it was going through the intersection. Her car spun around, the air bags were deployed and she thinks that she struck the steering wheel. She is unsure about loss of consciousness at the scene and was taken to the hospital. X-rays were performed which by her understanding were normal and she was allowed to be released. Since that time she has developed difficulty with increasing pain across her neck. She is seeing spots in front of her eyes and feels light-headed and dizzy at times.

(R. 712). Claimant continued to seek treatment for headaches and vision problems, which her neurologist opined were a result of, or exacerbated by, the automobile accident. (R. 715-31).

While the ALJ may have been correct that Claimant did not report hitting her head at the time of the accident, it is clear from the medical records that Claimant developed headaches and vision problems as a result of her accident and for which she sought treatment within three days after the accident occurred. Whether these symptoms resulted from Claimant hitting her head or from whiplash or "perhaps exacerbated by post-concussive phenomenon," as the neurologist suggested (R. 713, 722), it appears the ALJ has elevated semantics over substance by finding Claimant's testimony that she suffered a "head injury" (R. 29) as an "inconsistency" calling into question Claimant's credibility. Accordingly, the ALJ's determination in this regard is not supported by

16

substantial evidence in the record. *See Purcell v. Colvin*, No. 5:12-CV-376-D, 2013 WL 2352484, at \*4 (E.D.N.C. May 29, 2013) (remanding and adopting the conclusions in the memorandum and recommendation, including that the specific reasons cited by the ALJ regarding claimant's credibility were not supported by substantial evidence in the case record).

The Commissioner alternatively contends that the ALJ's other reasons for discounting Claimant's credibility–that she cared for her young children without assistance and had not worked since 2001 when she got married and pregnant–are sufficient to affirm the ALJ's credibility assessment. Def.'s Mem. at 9. Due to the lengthy treatment of the "head injury" issue by the ALJ, it appears that this was the primary reason for discounting Claimant's credibility and, thus, remand is warranted based on this error alone. It is noteworthy, however, that Claimant's mother testified as to periods after Claimant's 2005 accident when she assisted with the care of Claimant's children and household chores and that Claimant lived with her mother for two years and was unable to care for herself and her children (R. 71-75) and at least two treatment notes indicate Claimant had some limitations caring for her family and children (R. 623, 721). The record further indicates that Claimant began working at age 19 and worked for several years from 1993 until 2001, when she stopped working because she moved, married and had children, making it more cost effective for Claimant to stay at home (R. 45, 273-78). Accordingly, it is questionable whether the alternative reasons provided by the ALJ are supported by substantial evidence in the record or are sufficient alone to support the ALJ's credibility assessment in light of the first-noted error. While there may well be other evidence in the record the ALJ could cite to better support her determination, the reasons stated are insufficient. *See Mitchell v. Colvin*, — F. Supp. 2d —, 2014 WL 991705, at \*3 (E.D.N.C. Mar. 13, 2014) (concluding the ALJ erred in finding claimant's testimony not credible

17

where "the reasons the ALJ relied on for finding that the evidence did not support disabling pain are not supported by the record."). Therefore, it is recommended that the case be remanded for the ALJ to reconsider the credibility determination.

## C.  Evaluation of the Medical Opinions

Claimant contends the ALJ erred in giving little weight to the opinion of her treating physician Dr. David Adams, while giving significant weight to the consultative opinions of the DSS physicians. Pl's Mem. at 17-21, 29-30. Claimant also contends that the Appeals Council erred in failing to make part of the record the opinion of her treating physician Dr. Corina Pogodina. *Id.* at 18. The Commissioner responded that the ALJ provided good reasons for the weight given to the medical opinions and that those reasons are supported by substantial evidence. Def.'s Mem. at 9-13. Further, the Commissioner contends that Claimant has failed to show that Dr. Pogodina's opinion is new and material evidence. *Id.* at 19. The opinion of Dr. Pogodina is arguably corroborative of Dr. Adams' opinions and could impact the analysis thereof. Accordingly, the undersigned will first examine whether the Appeals Council should have made Dr. Pogodina's opinion part of the record.

Dr. Adams was Claimant's treating physician from 2008 to 2010. (R. 881-968, 1004-09). Claimant subsequently moved and established treatment with Dr. Pogodina on September 2, 2011. (R. 1158-64). On March 2, 2012, Dr. Pogodina completed a nine-page questionnaire, Pl.'s Mem., Attach. A [DE-26-2] at 2-10, which was substantially similar in form and substance to an earlier questionnaire completed by Dr. Adams (R. 1011-19). Claimant submitted Dr. Pogodina's opinion to the Appeals Council, but it was not incorporated into the record, because the Appeals Council determined the opinion was new information about a later time and did not affect the disability determination. (R. 2).

18

The Appeals Council must consider evidence submitted by a claimant with the request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991); 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1) ("The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision."). Evidence is new if it is not duplicative or cumulative, and material if there is a "reasonable possibility that the new evidence would have changed the outcome of the case." *Wilkins*, 953 F.2d at 96. "[T]he Appeals Council must consider new and material evidence relating to that period prior to the ALJ decision in determining whether to grant review, even though it may ultimately decline review." *Id.* at 95. The Appeals Council need not, however, review nor consider new evidence that relates only to a time period after the ALJ issues his decision. *See* 20 C.F.R. § 416.1476) (b)(1) (stating that, on review, "[i]f [a claimant] submit[s] evidence which does not relate to the period on or before the date of the [ALJ] hearing decision, the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his/her] right to file a new application.").

Dr. Pogodina's opinion was issued on March 2, 2012, roughly four months after the ALJ's decision, but it is noted on the report that Dr. Pogodina first treated Claimant on September 2, 2011, prior to issuance of the ALJ's October 21, 2011 decision. Pl.'s Mem., Attach. A [DE-26-2]. Claimant saw Dr. Pogodina twice prior to issuance of the ALJ's decision: Dr. Pogodina's treatment notes from Claimant's September 2, 2011 visit were submitted to the ALJ and are found in the record (R. 1158-64), and additional treatment records from Dr. Pogodina, submitted to and returned

19

by the Appeals Council, indicate that Claimant saw Dr. Pogodina in follow-up on October 4, 2011, prior to issuance of the ALJ's decision, Pl.'s Mem., Attach. F. [DE-26-7] at 77-82.

Dr. Pogodina's opinion, while issued after the ALJ's decision, arguably relates to Claimant's condition during the relevant time period, because it expressly encompasses Dr. Pogodina's treatment of Claimant during part of the relevant time period. There was no other opinion from Dr. Pogodina regarding Claimant's limitations in the record and, therefore, her opinion was not cumulative or duplicative. Furthermore, Dr. Pogodina's opinion arguably corroborates Dr. Adams' opinions and, therefore, is material. Accordingly, the Appeals Council should have made part of the record and considered Dr. Pogodina's opinion. *See Reed v. Colvin*, No. 3:13-CV-4647, 2014 WL 554693, at *27 (S.D. W.Va. Feb. 12, 2014) (remanding for other error, but directing the Commissioner to consider a consultative RFC opinion post-dating the ALJ's decision, purporting to cover the relevant time period, because the opinion "appears relevant, it appears to relate to the time period at issue in this case, and it was presented to the Appeals Council before its final decision.") (quoting *Young v. Barnhart*, 284 F. Supp. 2d 343, 353-54 (W.D.N.C. 2003)).

With respect to the ALJ's consideration of Dr. Adams' opinions, because the addition of Dr. Pogodina's opinion to the record may impact the weight given to Dr. Adams' opinions, the Commissioner should reconsider Dr. Adams' opinions. Moreover, while not deciding whether the ALJ erred in the consideration of Dr. Adams' opinion, the undersigned notes that it appears unclear whether the ALJ's reasons for discounting Dr. Adams' opinions are supported by substantial evidence.[3] For example, the ALJ specifically takes issue with Dr. Adams' opinion that Claimant is

---

[3] One reason given by the ALJ for discounting Dr. Adams' opinion is that Dr. Adams' findings are inconsistent with his own treatment notes. (R. 30). The majority of treatment notes from Dr. Adams in the record before the court are handwritten and illegible due to poor copying and/or writing. Perhaps the ALJ's copies were clearer and she was better able to read Dr. Adams' writing.

20

unable to work due to her "significant" scoliosis. (R. 30). The ALJ reasons that Claimant's scoliosis is congenital, that she had no significant problems prior to her alleged onset date, and that it did not worsen after her alleged onset date. *Id.* However, treatment notes from Claimant's previous treating neurologist, Dr. Susan Glenn, corroborate Dr. Adams' opinion and make clear that while Claimant's scoliosis was structurally stable, her pain related to the scoliosis was exacerbated by the 2005 automobile accident. (R. 719, 725, 730, 968). In fact, the ALJ appeared to acknowledge as much in her opinion. (R. 26 ("The claimant was lost to follow up after [1993], and it appears she had no further complaints with regard to her scoliosis until May 2005, when she was involved in a motor vehicle accident . . . .")). The ALJ also takes issue with Dr. Adams' ability to opine regarding the limitations from Claimant's scoliosis, because he is an internist and not an orthopedist.[4] (R. 30). Again, Dr. Adams treated Claimant's pain related to her scoliosis, and opined that Claimant continued to experience significant pain despite "chronic narcotic treatment" and that these medications also interfered with her ability to work (R. 968), which does not appear to be outside the expertise of an internist. *See Potter v. Astrue*, No. 3:05-0344, 2009 WL 529861, at *22 (M.D. Tenn. Mar. 2, 2009), (adopting report and recommendation concluding that in the context of a fibromyalgia diagnosis "an internist is equally qualified to complete a medical assessment of ability to do work as is an orthopedist."). While there may be other evidence in the record on which the ALJ could rely to support her conclusion, the evidence cited is questionable at best. Accordingly, it is recommended that on remand the Commissioner reconsider the opinions of Dr. Pogodina and Dr. Adams.

---

[4] Claimant points out that the DDS examiners, whose opinions were given "significant weight" (R. 30), concentrate in pediatrics and administrative medicine and law. Pl.'s Resp. at 5.

21

## D.  Remaining Assignments of Error

Claimant asserts additional assignments of error regarding the ALJ's evaluation of Claimant's fibromyalgia, the hypothetical posed to the VE, and the ALJ's conclusions regarding the jobs Claimant could perform. Pl.'s Mem. at 21-30. The ALJ's credibility finding and assessment of the medical opinions impact each of the ALJ's remaining determinations to which error is assigned by Claimant. The Claimant and Drs. Adams and Pogodina opined regarding the effects of Claimant's fibromyalgia. The ALJ's credibility determination and weight accorded to the treating physician's medical opinions are also integral to the ALJ's RFC assessment, which impacts the hypothetical to the VE and the Step Five consideration of jobs Claimant is capable of performing. Because the undersigned finds that on remand the issues of the treating physician's opinions and credibility will affect the remaining issues raised by Claimant, those arguments are not addressed at this time.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-25] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-30] be DENIED, and the case be remanded to the Commissioner.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected

to, and accepted by, the District Court.

SUBMITTED, this the 18th day of August 2014.

Robert B. Jones, Jr.
United States Magistrate Judge

23

## D. Remaining Assignments of Error

Claimant asserts additional assignments of error regarding the ALJ's evaluation of Claimant's fibromyalgia, the hypothetical posed to the VE, and the ALJ's conclusions regarding the jobs Claimant could perform. Pl.'s Mem. at 21-30. The ALJ's credibility finding and assessment of the medical opinions impact each of the ALJ's remaining determinations to which error is assigned by Claimant. The Claimant and Drs. Adams and Pogodina opined regarding the effects of Claimant's fibromyalgia. The ALJ's credibility determination and weight accorded to the treating physician's medical opinions are also integral to the ALJ's RFC assessment, which impacts the hypothetical to the VE and the Step Five consideration of jobs Claimant is capable of performing. Because the undersigned finds that on remand the issues of the treating physician's opinions and credibility will affect the remaining issues raised by Claimant, those arguments are not addressed at this time.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-25] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-30] be DENIED, and the case be remanded to the Commissioner.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days upon receipt to file written objections, response to which (if any) must be made within seven (7) days upon receipt of the written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected

to, and accepted by, the District Court.

SUBMITTED, this the 18th day of August 2014.

Robert B. Jones, Jr.
United States Magistrate Judge

23